**Randee HERBST, Plaintiff,**

v.

**SYSTEM ONE INFORMATION MANAGEMENT, L.L.C., d/b/a System One Company, Defendant.**

No. 1:96CV2094.

United States District Court,
N.D. Ohio,
Eastern Division.

Sept. 22, 1998.

Ellen Sacks Simon, Christopher P. Thorman, Lancione & Simon, Cleveland, OH, for Randee Herbst, plaintiff.

William J. O'Neill, McDonald, Hopkins, Burke & Haber, Cleveland, OH, Michael C. Towers, David R. Kresser, Jason J. Stout, Fisher & Phillips, Atlanta, GA, F. Kytle Frye, III, Fisher & Phillips, Atlanta, GA, for Defendant.

## MEMORANDUM OPINION AND ORDER

PERELMAN, United States Magistrate Judge.

Plaintiff, Randee Herbst, initiated this action in the Common Pleas Court of Cuyahoga County, from which it was removed to this federal court by the defendant, System One Amadeus, L.L.C. (formerly known as System One Information Management, L.L.C.) (hereinafter "System One"), alleging that in 1996 she was terminated from employment and denied rehire by reason of her age, in violation of the federal Age Discrimination In Employment Act of 1967 (ADEA), 29 U.S.C. § 621 et seq., and the Ohio Civil Rights Act (OCRA), Ohio Revised Code §§ 4112.99 and 4101.17. The complaint also asserts causes of action under the common law of Ohio, including claims for breach of contract and promissory estoppel.

System One markets and provides travel-related services to travel agencies, airlines, cruise lines and hotels through an automated

computer reservations system. Plaintiff was employed by System One and its predecessor companies for 41 years, starting her career in 1956 at Eastern Airlines as a reservation agent and flight attendant.[1] During her employment with System One plaintiff held the positions of Product Manager (1986–1989); District Manager (1989–1991); Corporate Account Executive (1991–1992); and National Sales Manager (1992–1996).

Evidence of plaintiff's on-the-job performance is found in an affidavit of Mr. Bill Nelson, plaintiff's immediate supervisor for several years prior to his departure from the company in 1995,[2] who described her as "an outstanding performer," "the best of any National Sales Manager that proceeded her" and "one of the most productive and versatile of all of the National Sales Managers." Additional evidence is found in a letter of reference provided by Mr. Nelson in which he stated in pertinent part:

I would like to offer this recommendation to anyone considering offering employment to Randee Herbst. As her supervisor for the last three years I can recommend Randee as one of my best employees. Randee has been a dedicated and solid performer in her position as National Sales Manager. She was the only manager that I was able to identify that was able to effectively manage our second largest customer, Uniglobe International Travel. She is a very hard worker that throws herself at her work. She is extremely proficient at relationship selling, and wrapping her arms around the customer. She is also very skilled at working customer meetings and conventions and representing System One in the best possible light.

I can only provide my highest recommendation to anyone considering employing Randee. She will be an asset to any organization.

Concurring in the foregoing was Mr. John Dean, Vice President of Uniglobe International Travel, who wrote in his letter of reference:

During the time that Randee has managed the Uniglobe account for System One, our business has increased significantly. Randee has been very adept at managing the needs of a large and very demanding organization such as UNIGLOBE. She has displayed excellent sales leadership in motivating her field sales people responsible for managing our account on a local basis. She has shown that she can "get things done" despite any obstacles that might come her way. In a business that relies heavily on good relationships, Randee has patiently built excellent relationships at all levels of our organization.

In late 1995 to early 1996, upon undergoing a review of business initiatives and strategy, System One projected losses in revenue in fiscal year 1996. Consequently, System One underwent a reorganization which included a reduction in force (hereinafter "RIF"). Specifically, effective March 1, 1996 certain positions were eliminated and 163 employees, including plaintiff, were terminated. Overall, there was a 16% reduction in the total pre-RIF workforce of 1006 employees. Of the 163 employees terminated 62 were younger than age 40 and 37 were between the ages of 40 and 45.

At the time of plaintiff's termination she was 61 years of age and one of four National Sales Managers, the others being Ms. June Belsanti, then age 40, who was based in the Chicago area; Ms. Valerie Gibson, then age 40, who was based in the Charlotte area; and Ms. Kate Farrell, then age 45, who was based in the New York area. The National Sales Managers were part of the company's Sales and Marketing Division.

Mr. James Davidson was the Vice President of the Sales and Marketing Division at the time of the RIF. Answering to him were four Sales Directors: Mr. Charles Gallina in the northeast region; Mr. Dick Schmidt in

---

1. After Eastern Airlines was purchased by Texas Air in 1986 the purchaser spun off System One. The former Eastern Airlines employees were permitted to retain the date they were first employed at that company as their service date with System One.

2. Defendant represents in briefing that Mr. Nelson was "terminated for performance reasons in December, 1995 before the at-issue RIF[.]"

the southern region; Mr. Chris Gruenwald in the central region; and Mr. Ron Hale in the western region. Each had sales representatives and other sales staff who reported to him.

As a consequence of the RIF came restructuring of the Sales and Marketing Division which resulted in termination of 60 employees within that division, including three of the four National Sales Managers, those being Ms. Belsanti, Ms. Gibson and plaintiff. Mr. Davidson, who made the personnel decisions, testified during his deposition that Ms. Farrell was retained "because of her expertise in Max," which is "a back office accounting product that [System One] sold to large customers as well" which the others lacked. Ms. Farrell, who had at one time been a Max sales manager, had American Express as one of her Max system accounts.

As part of the restructuring Mr. Schmidt was moved from his position as Sales Director of the southern region to the position of Multi–National Sales Director. In that position he serviced some customers which had been assigned to the four National Sales Managers, although other of their customers were dropped. Sometime after he began working in that position Mr. Schmidt realized that he needed additional support in order to fulfill his obligations, and turned to Mr. Davidson with a request for assistance. They decided to hire Ms. Mayre Veite, a 63–year–old employee of the Sales and Marketing Division,[3] to assist Mr. Schmidt in his duties. Ms. Veite's responsibilities included some that had been performed by plaintiff.

In a letter to Mr. Davidson dated March 12, 1996 the plaintiff reviewed the highlights of her tenure with the company and discussed her assets, stating in pertinent part:

On February 26, 1996 1 was advised that I would be terminated from System One effective March 1, 1996. I was given the reason that my department was dissolved due to restructuring of the company.

I understand the reason for cutbacks in any company is to focus on the bottom line—"PROFIT." I always had that in mind during my tenure with Eastern Airlines and System One and realize these things have to be done no matter how unpleasant the task.

\* \* \* \* \* \*

In closing I an asking for an equal position in the company and feel there is a mutual advantage for me to be reinstated. I appreciate your consideration and look forward to your reply.

In mid-April of 1996 System One posted 16 positions identified as Regional Consolidation Coordinators (hereinafter "RCC"), which were new to the company. These positions were intended to be temporary, and designed to assist System One clients in converting from one computer system to another. Unlike the positions held by the plaintiff these were not sales positions, and required a great deal of technical expertise in the computer systems.

In a letter dated May 2, 1996 directed to Ms. Maritza Ortiz plaintiff asked to be considered for the position of Regional Consolidation Coordinator in Cleveland. On or about May 21, 1996 Mr. Kent Chamberlain, the hiring manager for the RCC position, interviewed plaintiff. At that time she was the only interviewee. While he ultimately decided that he would like to offer plaintiff the position, and made such a recommendation to Mr. Davidson, the following deposition testimony reflects that he had some degree of concern as to her technical qualifications:

Q: And you knew based on her experience and your experience that she had the qualifications for the position, correct?

A: There were some hesitations in some of her qualifications, but I felt generally she could do the job with some additional training and coaching.

\* \* \* \* \* \*

Q: And had hands-on technical knowledge of the system so that she could have done the job that she previously had done for the company, correct?

---

**3.** Ms. Veite's position as sales manager in the Sales and Marketing Division was scheduled for elimination in late 1996. She remained in that position until her voluntary retirement in February of 1997.

A: I'm not sure that's totally correct. I think that the actual level of expertise as far as functionality goes was always in debate.

Q: Well, the regional consolidation coordinator position is not a technical job, correct?

A: I don't totally agree with that, no.

Q: Okay. Well, it's not identified as a technical job is it?

A: It does require a great deal of functional and technical expertise. And it was, if I remember correctly, identified as such in the posting. "Comprehensive knowledge of System One functional—" "functionality and solid technical understanding of the system."

Q: And she had that, didn't she?

A: I don't—I don't believe that she had that completely.

Q: Well, you didn't know if George had it completely either, did you?

A: Yes, I think I did.

Mr. Chamberlain further testified that when he recommended to Mr. Davidson, who was two levels higher in the company hierarchy, that the plaintiff be hired for the Cleveland RCC position Mr. Davidson instructed him, without further comment, that she was not to be hired and that he should find additional applicants. During his deposition testimony, Mr. Davidson explained his rationale:

Q: Did you believe that she should not get this position because of her professional image?

A: I believe there were at least four reasons why I didn't believe she was the right candidate for this job.

The first one was that it was not an equal position where she was. It was a temporary position, an RCC position that was developed to be temporary, primarily through the duration of consolidation of Unison, which now is anticipated to be ending in the end of January or sometime mid February.

The second thing was the pay scale was significantly less than what Randee was making. The average RCC, I think—I don't know the specifics, but I'm going to guess it's around 30 or $35,000.

My guess, knowing where Randee—now I do know what she was making at the time—was making significantly more than that.

As her letter states, she was looking obviously for an equal position. That is not an equal position.

The RCC job was not a sales job. Randee's background is in sales at many levels. She has had sales—and she was district sales manager. She was a national sale manager. Which, by the way, part of her job was to bring in new business in addition to supporting.

This was neither of those. The RCC job was neither of those.

And the fourth thing is there was one incident where I questioned her judgment.

Those four incidents, and the fact that she's had a history of lateral moves, did not put her in the best position in my light for this position.

\* \* \* \* \* \*

A: Right. In addition to that, he brought to me only one candidate who we were going to bring someone from the outside back into the company.

We had just gone through a very painstaking effort to reduce 150 people out of the organization. We were very sensitive to bringing anybody back into the company from the outside. For bringing additional heads into the organization was sensitive, yeah.

I had asked Kent Chamberlain to see if we could find additional applicants at the time.

As regards the incident at the heart of the fourth reason, Mr. Davidson testified:

Q: Well, why don't you tell me when this occurred, this event occurred.

A: In happened at a Christmas dinner with the national sales team. And Christmas—it would have been '95, Christmas of '95. It was in December at some point.

I don't—the national sales team was having a—they have departmental meetings

and they were reviewing their plans for the next—for '98. And it happened at a dinner that evening.

\* \* \* \* \* \*

Q: And can you tell me what it is that she did?

A: Yes. She, sitting across the table, she lifted her sweater up.

\* \* \* \* \* \*

Q: Why didn't you say anything to her about it if you felt so strongly about it?

A: I spoke to her supervisor Bill Nelson about it and asked him to let her know that it was inappropriate.

After speaking with Mr. Davidson Mr. Chamberlain interviewed, and ultimately hired, Mr. George Mason, a System One employee who had not been laid off in the RIF, to fill the job the plaintiff had sought. Mr. Mason's prior experience included employment in 1992 at a Uniglobe Travel Agency in sales and, more importantly, as a systems administrator. He was hired as a sales manager at System One in 1994. When asked during his deposition to compare the plaintiff's qualifications with Mr. Mason's, Mr. Chamberlain stated:

Q: Now, objectively speaking, you would agree that Randee had better qualifications for the position than Mr. Mason? And, again, I know that you were not comparing them side by side. But would you agree with me that, if you did compare them side by side, that Randee Herbst had better qualifications for the position?

A: No, I would not. I would deem them at least equal but I would not—and different, but not better.

Q: Why is that?

A: One of the biggest reasons is, is I believe George had a little more functional hands-on everyday technical knowledge than Randee did. I believe that Randee's organizational skills were a little better than George's. They were just different. They were stronger in some areas and weaker in others from each other.

Q: Well, you would not say, then, that he was better qualified than she was, correct? That's not what you're saying?

A: I think in some areas.

Although Mr. Nelson had left System One prior to the RIF and the subsequent posting of the RCC position prior to his departure he helped to formulate the RCC position. In his affidavit Mr. Nelson described plaintiff as "eminently qualified" for that position due to her "strong interpersonal communication, automation skills, and a customer empathy."

Of the 16 RCC positions 13 were filled by candidates who were employed with System One at the time, 7 of whom were over the age of 40, and two were former employees, ages 52 and 58, who had been laid off in the RIF.

Of a total of 163 employees terminated in the RIF over a period of time thirty were rehired by System One. Of those, 23 were over the age of 40 and 9 were over the age of 50.

Defendant claims entitlement to summary judgment on plaintiff's claim of age discrimination premised upon her termination arguing that she has failed to establish a prima facie case of age discrimination, but that if a prima facie case has been made System One has provided legitimate, non-discriminatory reasons for terminating plaintiff and that she has failed to provide evidence of pretext. As regards plaintiff's claim of age discrimination based upon the failure to hire her for the RCC position defendant argues that it has provided a legitimate, non-discriminatory reason for not hiring her and that she has failed to offer evidence of pretext. Defendant further argues that summary judgment is warranted on plaintiff's breach of contract claims by reason of language in its employee handbook and admissions by plaintiff pertaining to the nature of her employment. Finally, defendant contends that it is entitled to summary judgment on the plaintiff's promissory estoppel claim because the plaintiff did not rely on any unambiguous promise made to her nor was there any expectation which reasonably would induce action or forbearance by her.

Plaintiff counters that summary judgment should be denied for the following nine reasons: (1) a prima facie case of discrimination has been established; (2) discrimination may be inferred by System One having failed to place terminated employees in available positions for which they were qualified; (3) plaintiff was considered as "overqualified" for a position she pursued; (4) plaintiff's responsibilities were not eliminated and a younger employee was retained to perform comparable work; (5) the manner in which defendant made the decisions to terminate and to refuse to hire plaintiff was discriminatory; (6) a factfinder would be permitted to infer pretext by reason of defendant's failure to comply with its RIF policy; (7) pretext is evidenced by defendant's inconsistent explanations for not offering plaintiff the RCC position; (8) defendant's statistical evidence is irrelevant; and (9) defendant breached its employment contract by discharging plaintiff in a manner which violated company policy.

The disposition of a motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides for the granting of such motion only where, "[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." It is the court's function under such a motion to determine whether a genuine issue of material fact exists, as opposed to endeavoring to resolve any such factual issues. *Tee–Pak, Inc. v. St. Regis Paper Co.,* 491 F.2d 1193 (6th Cir.1974); 6 *Moore's Federal Practice* 56.15 [1.–0].

It is the initial burden of the moving party to demonstrate the absence of a genuine issue of material fact as to an essential element of the claims brought by the non-moving party. *Curto v. Harper Woods,* 954 F.2d 1237, 1241 (6th Cir.1992); *Wilson v. Zanesville,* 954 F.2d 349, 350–351 (6th Cir.1992); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472 (6th Cir.1989).

In *Street v. J.C. Bradford & Co., supra,* the Sixth Circuit Court of Appeals reviewed three then recent decisions of the United States Supreme Court addressing summary judgment practice, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).[4] The court summarized those cases as standing for a number of new principles in summary judgment practice, including the fact that cases involving considerations of state of mind issues (such as discriminatory action) are not automatically inappropriate for summary judgment; that a federal directed verdict standard ("whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law") should be applied to summary judgment motions; that a non-moving party must provide "more than a mere scintilla of evidence" to avoid summary judgment; that the substantive law applicable to the cause of action will govern the materiality of the issues of fact; that the court has no duty to search the record to determine the existence of genuine issues of material fact; and perhaps most significant, that a trial court has more discretion than it would have in the past in weighing the evidence offered by the non-moving party, considered in light of the whole record, to determine whether that party's evidence does "more than simply show that there is some metaphysical doubt as to the material facts" or whether it demonstrates that the non-moving party's claims are "implausible". *Id.* at 1479–1480 (Footnotes and citations omitted.)

The seminal case on employment discrimination is *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), wherein the Supreme Court delineated a four part formula for establishing a prima facie case: (1) that the plaintiff is a member of a protected class; (2)

---

4. The court's reference to those rulings as representing a "new era" of "dramatic change" may no longer hold true nine years later, but the characterization of their import as to motions for summary judgment being viewed with "more favorable regard" certainly remains true.

that he/she was qualified for an identified position; (3) that he/she was discharged or denied employment; and (4) that the position in question was filled by a non-member of the protected class. *Id.* at 802, 93 S.Ct. 1817. This test is also used by the Ohio courts when considering alleged violations of Ohio's anti-discrimination statutes. *Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992).

■ In cases where there has been a work force reduction and the position in question was not filled the fourth element may be satisfied by the plaintiff providing "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Reeher v. Baker Material Handling Corp.,* 996 F.2d 1216, (6th Cir. 1993), citing *Barnes v. GenCorp., Inc.,* 896 F.2d 1457, 1465 (6th Cir.1990). The Sixth Circuit Court of Appeals has provided the following guidance for determining whether there has been a reduction in force:

> A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. *However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.* A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

*Barnes v. GenCorp. Inc., supra* at 1465 (Emphasis added.) (Citations and footnotes omitted.)

This Court finds that the evidence of record, particularly the testimony of Messrs.

Davidson and Schmidt regarding the events leading up to plaintiff's discharge, as well as the manner in which her former duties were redistributed, unquestionably demonstrates that there was a reduction in force in this case. The plaintiff has failed to offer any evidence which could lead this Court to find other than that business considerations caused the defendant to eliminate one or more positions, including hers, within the company.

Adherence to the *McDonnell Douglas* formula is not required when there is direct evidence of discriminatory intent on the part of the defendant. *Shah v. General Elec. Co.,* 816 F.2d 264 (6th Cir.1987) (plaintiff established prima facie case of discrimination even though she was not replaced after her discharge where she presented other evidence of discriminatory motive); *Mills v. Ford Motor Co.,* 800 F.2d 635, 639 (6th Cir.1986) ("All the plaintiff must establish at the prima facie stage is that her discharge raised an inference of discrimination"); *Duchon v. Cajon Co.,* 791 F.2d 43 (6th Cir.1986) (female plaintiff established prima facie case when she showed that she was discharged for engaging in an affair with a man in the office who was not likewise discharged); *Mauzy v.. Kelly Services, Inc.,* 75 Ohio St.3d 578, 664 N.E.2d 1272 (1996) (the plaintiff established a prima facie case of age discrimination through the presentation of direct evidence of age related animosity including statements by the employer in which she expressed a preference for younger employees and commented that the plaintiff should "take the money and run" when inquiring into the plaintiff's plans to retire, and wrote in an evaluation that "you can't teach an old dog new tricks.") [5]

There is no direct evidence of age animus in the present record. Therefore, for the plaintiff to succeed on her discharge claim there would need to be evidence from which

---

**5.** In contrast in *Byrnes v. LCI Communication,* 77 Ohio St.3d 125, 672 N.E.2d 145 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2480, 138 L.Ed.2d 989 (1997) the court found that there was insufficient direct evidence of age related hostility toward two employees who were discharged where the employer, over the course of several years, had made a number of comments indicating a desire for younger employees in

positions other than those held by the plaintiffs. The only comment directed at one of the plaintiff was by the CEO who questioned whether the plaintiff was suffering from Alzheimer's disease. The court found that that single comment was insufficient to raise a genuine issue of fact as to age related animosity despite the myriad comments made with respect to other employees.

this Court could infer an invidious intent to discriminate with regard to her termination.

Once a prima facie showing of discrimination is made there is a rebuttable presumption that the employer has engaged in impermissible age discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). At that point the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment decision. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Turic v. Holland Hospitality, Inc.,* 85 F.3d 1211, 1214 (6th Cir.1996). Stated differently, that presumption may be rebutted by the production of evidence that "the plaintiff was rejected, or someone else was preferred, for a legitimate, non-discriminatory reason." *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1082 (6th Cir.1994) (quoting *Texas Department of Community Affairs v. Burdine,* supra at 254, 101 S.Ct. 1089).

■ Once the employer has met the foregoing burden of production the presumption of discriminatory animus is no longer in effect and the employee must satisfy the factfinder that the termination was motivated by discriminatory animus, taking into consideration all evidence of record, including any evidence indicating that the reason articulated by the employer for the termination was pretextual. This may be accomplished either by showing that the proffered reason is unworthy of belief or that the true reason for the plaintiff's rejection, notwithstanding the proffered reason, was of a discriminatory nature. *Goostree v. Tennessee,* 796 F.2d 854 (6th Cir.1986), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1374, 94 L.Ed.2d 689 (1987).

"Pretext may be shown 'either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1082 (6th Cir.1994) (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)). In order to challenge the

credibility of an employer's explanation, the plaintiff must show by a preponderance of the evidence: (1) the proffered reasons had no basis in fact; (2) the proffered reasons did not actually motivate the adverse employment action; or (3) the proffered reasons were insufficient to motivate the adverse employment action. *See Manzer,* 29 F.3d at 1084 (quoting *McNabola v. Chicago Transit Authority,* 10 F.3d 501, 513 (7th Cir.1993)).

*E.E.O.C. v. Yenkin–Majestic Paint Corp.,* 112 F.3d 831, 834 (6th Cir.1997). The plaintiff always retains the ultimate burden of persuasion. *Ibid,* citing *Wrenn v. Gould,* 808 F.2d 493, 500 (6th Cir.1987).

When the foregoing issues are raised upon a motion for summary judgment the following applies:

In the context of a summary judgment proceeding, [*St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ] requires that, once the employer has advanced a legitimate, nondiscriminatory basis for its adverse employment decision, the plaintiff, before becoming entitled to bring the case before the trier of fact, must show evidence sufficient for the factfinder reasonably to conclude that the employer's decision to discharge him or her was wrongfully based on age... "Direct or indirect evidence of discriminatory motive may do but 'the evidence as a whole...must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by age animus.'" ... Thus, the plaintiff cannot avert summary judgment if the record is devoid of adequate direct or circumstantial evidence of discriminatory animus on the part of the employer.

*LeBlanc v. Great American Ins. Co.,* 6 F.3d 836, 843 (1st Cir.1993) (Citations and footnotes omitted.) Accord, *Manzer v. Diamond Shamrock Chemicals Co.,* supra at 1083, n. 3.

■ Although disbelief of the employer's proffered reason for discharge together with the facts making up the prima facie case may suffice to show discrimination, "nothing in law would permit [a court] to substitute for the required finding that the employer's ac-

tion was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 514–15, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

There is no dispute that as regards her termination the plaintiff can satisfy the first three elements of the *McDonnell Douglas* formula as she is a member of the protected class, there is no challenge to her qualifications for the position she held, and she was discharged. The dispute lies with the fourth element, with defendant asserting that because this is a case involving a reduction in force the plaintiff must demonstrate that defendant failed to treat age neutrally upon her termination.

■ Looking to the facts previously set forth, this Court finds that there is no evidence to support plaintiff's conclusory assertions that age was a factor in her termination.

In light of plaintiff's failure to satisfy the fourth element of those required to establish a prima facie case of discrimination pertaining to her termination summary judgment on her termination claim is warranted.

Further, if this Court was to find that plaintiff had met her burden of establishing a prima facie case the end result would not differ.

■ The defendant has met its burden of producing evidence of a non-discriminatory reason for terminating plaintiff. This Court finds that such evidence demonstrates that the RIF which caused the defendant to eliminate numerous positions within the company, including two other National Sales Managers who were more than 20 years younger than plaintiff, was motivated by business considerations. It is not the function of the courts to second-guess legitimate business decisions.

The defendant having met its burden of producing evidence of a non-discriminatory

reason for terminating the plaintiff, she must establish that the defendant's articulated reason for her individual termination is a pretext for age discrimination. In order to do so, plaintiff must establish by a preponderance of the evidence that the proffered reason, in this case the RIF, did not actually motivate the decision to terminate her.

Plaintiff offers as evidence of pretext "the cursory, unstructured, undocumented and subjective manner in which the defendant made its decision" to terminate her and that the defendant "failed to comply with its own reduction in force policy." In support of her position plaintiff relies upon the failure of Mr. Davidson to credit job performance assessments by others in System One management in making the decision to terminate her.

The weakness in plaintiff's evidence in support of this rationale is that not only is there an absence of contemporaneous documents created with regard to plaintiff's termination but there are also no contemporaneous documents pertaining to the other two (and much younger) National Sales Managers terminated at the same time as plaintiff.[6] Mr. Davidson testified that because there were only four people in those positions he was familiar with their job duties and performance and it was unnecessary for him to officially evaluate them prior to making the decisions as to which would be terminated.[7]

The plaintiff having failed to designate specific facts to demonstrate that the defendant's reason for her termination is a pretext for age discrimination, summary judgment on the termination claim is mandated.

With regard to the refusal to hire plaintiff for the RCC position there is a dispute between the parties as to whether the plaintiff was qualified for the position and whether there was discriminatory animus in that refusal.

---

**6.** The lack of such contemporaneous documentation, without more, is insufficient to support plaintiff's burden of demonstrating pretext.

**7.** While the evaluations of Ms. Holtzman were not considered by Mr. Davidson in making his

decision to terminate plaintiff, the fact that she also rated Ms. Farrell higher than plaintiff overall bolsters the credibility of Mr. Davidson's assessment.

Plaintiff argues that she was better qualified for the RCC position than Mr. Mason, the man hired to fill that position, that the manner in which defendant made the decision to refuse to hire her was discriminatory, and that pretext is evidenced by defendant's inconsistent explanations for the failure to hire.

Defendant does not challenge whether plaintiff has met her burden of demonstrating a prima facie case of discrimination pertaining to the failure to hire her for the RCC position but, rather focuses on the fact that it has articulated a legitimate, non-discriminatory reason for such action. In this regard the defendant relies upon the deposition testimony of Messrs. Davidson and Chamberlain.

As previously noted, Mr. Davidson provided four reasons for his instruction to Mr. Chamberlain that the plaintiff not be hired for the RCC position: (1) he believed that the RCC position was not an "equal position" to her previous job, and therefore, would not fulfill her request to him; (2) the pay scale was significantly less than she had previously earned; (3) the RCC job was not a sales job as her other positions within the company had been; and (4) he questioned her judgment in light of an incident where she had lifted up her sweater while seated in front of him at a company holiday dinner.

Again as previously noted, Mr. Chamberlain, who had been in favor of hiring plaintiff to fill the RCC position, could not agree that plaintiff was more qualified than Mr. Mason · for the position. Instead he stated that he believed that Mr. Mason "had a little more functional hands-on everyday technical knowledge than [plaintiff] did," but that plaintiff had better organizational skills than Mr. Mason. When asked whether he believed Mr. Mason to have been better qualified than plaintiff for the RCC position, Mr. Chamberlain responded that "in some areas" he was more qualified.

In this Court's opinion, while there is a conflict between the testimony of Messrs. Davidson and Chamberlain, Mr. Chamberlain's testimony suffices to satisfy the defendant's limited burden of presenting a legitimate, non-discriminatory reason for not hiring plaintiff. Therefore, the plaintiff must establish that the stated reason for failing to hire her is a pretext for age discrimination.

Plaintiff offers as evidence of pretext the "inconsistent explanations for not offering [plaintiff] the RCC job," particularly Mr. Davidson's statement made during a taped telephone conversation with her that she was not hired for the RCC job based upon the lack of "specific skills" they were looking for at the time. According to plaintiff that statement is inconsistent with the reasons offered by Mr. Davidson during his deposition and in his affidavit, from which it could be inferred that the proffered explanation did not actually motivate the employer.

■ An employer's stated reasons for a challenged action which are inconsistent or unsupportable may be considered to mask discriminatory motive. *Perfetti v. First National Bank of Chicago*, 950 F.2d 449, 456 (7th Cir.1991), *cert. denied*, 505 U.S. 1205, 112 S.Ct. 2995, 120 L.Ed.2d 871 (1992). Thus, a showing of inconsistencies may be found to constitute evidence of pretext.

■ This Court is of the opinion that the discrepancy between the statement of Mr. Davidson that he was sure that the decision not to hire plaintiff for the RCC position was "based on some skills we were looking for at the time" and the four reasons he offered in his deposition and affidavit for deciding not to hire creates a genuine issue of fact as to pretext. This is particularly true considering that Mr. Chamberlain testified that when he was instructed not to hire plaintiff, despite the fact that he was in favor of doing so, Mr. Davidson did not make any statement to him regarding the plaintiff's experience in light of particular skills called for in that position.

Having so found, this Court must deny defendant's motion for summary judgment on the claim based upon defendant's failure to hire plaintiff for the RCC position.

Defendant also claims entitlement to summary judgment on plaintiff's causes of action under Ohio law for breach of employment contract and promissory estoppel regarding lay-off and rehiring of employees.

Ohio adheres to the presumption that unless specifically designated for a fixed term employment relationships are "at will," meaning that either party may terminate the relationship at any time for any reason (not prohibited by law), or for no reason. *Wright v. Honda of America Mfg.*, 653 N.E.2d 381, 73 Ohio St.3d 571, 574 (1995). That rule is not immutable, however, as in Ohio there are two exceptions: "(1) the existence of implied or express contractual provisions which alter the terms of discharge; and (2) the existence of promissory estoppel where representations or promises have been made to an employee." *Id.* Plaintiff maintains that both exceptions apply to this action.

To prove the existence of an enforceable employment contract an employee must establish that there was an offer, acceptance, and consideration. *Tersigni v. General Tire, Inc.*, 633 N.E.2d 1140, 91 Ohio App.3d 757, 760 (Summit County 1993). "An essential element needed to form a contract is that the parties must have a distinct and common intention which is communicated by each party to the other." *McCarthy, Lebit v. First Union Management*, 622 N.E.2d 1093, 87 Ohio App.3d 613, 620 (Cuyahoga County 1993). Specific promises of job security can create an exception to the employment-at-will doctrine. *Helmick v. Cincinnati Word Processing, Inc.*, 543 N.E.2d 1212, 45 Ohio St.3d 131, syllabus 3 (1989).

In *Weiper v. W.A. Hill & Associates*, 661 N.E.2d 796, 104 Ohio App.3d 250, 257 (Hamilton County 1995) the plaintiff was hired by the defendant employment agency as an at-will employee. After his employment was terminated the plaintiff sued on the theory that his employment status had been altered by assurances of continued employment, including that the defendant told him that he envisioned the plaintiff making "a lot of money for the company for a long time to come." Despite the lack of any specific promise of continued employment the plaintiff's interpretation of that comment was that he had a job with the company so long as he continued to make money. The court found that the element of mutual intent to bind was absent from the alleged agreement, stating that:

[T]he only evidentiary materials presented by Weiper to contradict the at-will nature of his employment are conclusions which he individually drew with respect to his employment based upon his own personal expectations and the meaning he gave to the company's praise for his work performance. There is no evidence of specific promises made by the company which would allow one to reasonably conclude that W.A. Hill mutually assented to anything other than an at-will employment. Weiper's failure to grasp the employment-at-will nature of his hiring, and his subjective interpretation of praise given for his work, leading to a personal but objectively unfounded sense of job security, cannot alter in law the at-will nature of his job status.

In illustrative contrast to the decision in *Weiper* the court in *Bruno v. Struktol Co. of America*, 576 N.E.2d 821, 62 Ohio App.3d 509 (Summit County 1991) found that the plaintiff who had been terminated from his employment presented evidence that the at-will nature of his initial employment had been altered by specific assurances from his employer that "with satisfactory job performance he would be employed with Struktol until the retirement age of sixty-five and that this would be his last employment." The court found the specificity of this comment sufficient to create a genuine issue of fact as to whether the defendant made an offer of employment for a specific duration.

In *Tersigni v. General Tire, Inc.,* *supra* the plaintiffs were laid-off and filed suit alleging that they were discharged in contravention of defendant's history of application of a bumping policy, whereby less senior employees would be laid-off before more senior employees, and that they did not seek other employment in reliance on that policy. The court found that the bumping policy was specific and had been adhered to for over ten years "with management expecting employees to be aware of, and rely on" its procedures. Based upon these circumstances the court found that the policy constituted an "offer" to the employees thereby altering the employment relationship.

As evidence of an enforceable employment contract with specific promises of job security the plaintiff relies upon the System One employee handbook in effect at the time of the RIF which addressed layoffs/RIFs in the following paragraph:

### G. Layoff/Reduction in Force

██ It is the goal of the Company to maintain its employee group intact. If made necessary by economic conditions, employees will be redeployed to other positions wherever possible. If employee headcount must be reduced, the objective of the Corporation is to retain the most productive and versatile employees.

If suitable alternative positions are not available within the Company, employees laid off as a result of a reduction in force shall be treated·fairly and with due regard for Company service.

Contrary to plaintiff's interpretation, this Court concludes that the foregoing does not include specific promises of job security, but, rather, vague assertions that the employer will redeploy laid off employees "wherever possible" and that laid off employees will be "treated fairly and with due regard." Plaintiff admitted during her deposition testimony that no other oral assurances of job security were made by any representative of her employer. Under the authorities set forth previously, such vague assertions do not create an exception to the employment-at-will doctrine.[8]

The same rationale applies to plaintiff's assertions that in this case there is an exception to the employment at will doctrine actionable under promissory estoppel.

 To establish the existence of promises or representations sufficient to alter the at-will nature of an employment relationship a plaintiff must show that there was: (1) an unambiguous promise; (2) reasonable and foreseeable reliance by the employee on that promise; and (3) detriment to the employee as a result of such reliance. *Stull v.*

*Combustion Engineering, Inc.,* 595 N.E.2d 504, 72 Ohio App.3d 553, 557 (Seneca County 1991). In order to shape an actionable promissory estoppel claim the "promise relied upon must be clear and unambiguous in its terms and the reliance must be reasonable and foreseeable." *Condon v. Body, Vickers & Daniels,* 649 N.E.2d 1259, 99 Ohio App.3d 12, 20 (Cuyahoga County 1994).

In *Condon,* the plaintiff, an associate at a law firm, alleged that his termination violated a promise to retain him for at least five years in a patent law training program. Although the plaintiff admitted that he was never guaranteed continued employment it was undisputed that upon his hire and thereafter he was told that the firm was looking for an associate to participate in a five-year training program, after which the associate was expected to take the patent bar exam. The plaintiff was also told on several occasions that he was well-liked and that the firm was pleased with his work. As to his alleged reliance on the firm's representations the plaintiff maintained that during his employment with the firm, he refused an offer of employment with the Florida Department of Environmental Protection.

The court found that the comments made to the plaintiff did not amount to an implied contract for a period of years in light of the fact that, while there was an expectation within the firm that associates would train for a career in patent law, there was no guarantee of continued employment and, typically, there was no specific time period allotted for that training. The court additionally found that the firm's expressions of satisfaction with the plaintiff's work did not alter the at-will nature of his employment because there was no evidence that the comments were intended by the defendant to alter or create an employment contract for a specific term. As to the plaintiff's alleged rejection of another job offer the court stated that the firm had no reason to know of the offer of employment or the plaintiff's refusal thereof and, therefore, his reliance, albeit arguably detrimental, was not foreseeable.[9]

---

**8.** This Court also finds merit in the argument of defendant that under the "Internal Placement" provision in the employee handbook plaintiff was not entitled to "priority consideration" because an internal candidate and not someone outside the company was hired for the RCC position.

**9.** In fact, the court found that it was not detrimental as it entailed a significantly smaller salary

In *DeCavitch v. Thomas Steel Strip Corp.*, 585 N.E.2d 879, 66 Ohio App.3d 568 (Trumbull County 1990), the plaintiff was hired subject to three conditions: first, she was required to take a physical exam; second, she had to agree to stay with the company for two years; and third, if she left before the expiration of two years she was to repay a prorated portion of the placement fee paid to an employment agency through which she had sought employment. The plaintiff additionally signed an employment agreement which provided that her "employment may be terminated at any time for such reason not prohibited by statute." The plaintiff was terminated after one and one half years, and filed suit. The employer appealed a jury verdict in favor of the plaintiff and the trial court's denial of its motion for directed verdict or judgment notwithstanding the verdict.

The court of appeals reversed, finding that reasonable minds could only conclude that the plaintiff had an at-will employment agreement. The fact that one of the conditions of her employment contemplated the possibility that she might leave prior to the conclusion of two years and the existence of the employment agreement which clearly reflected that she was an at-will employee precluded a finding that she could reasonably have relied on any extra-contractual assurances of a two year term of employment.

Similarly, the court in *Boggs v. Avon Products*, 564 N.E.2d 1128, 56 Ohio App.3d 67 (Butler County 1990) found that assurances that an employee need not fear loss of employment so long as he maintained a good attendance record did not amount to a promise that he could be discharged only for poor attendance, or otherwise alter the at-will nature of his employment.

Applying the foregoing to the present case, there is no evidence of unambiguous promises which altered the at-will nature of plaintiff's employment. Further, there is no evidence of detrimental reliance upon any alleged promises of such a nature.

In light of the foregoing, this Court concludes that there is no genuine issue of mate-

rial fact as to the breach of employment contract and promissory estoppel claims, and that defendant is entitled to summary judgment on those claims.

In summary, this Court grants defendant summary judgment upon that portion of plaintiff's first cause of action for discrimination which rests upon termination during the 1996 RIF, but denies summary judgment upon that portion of plaintiff's first cause of action which is premised upon the failure to hire her for the RCC position. Summary judgment is also granted upon plaintiff's second cause of action for breach of employment contract and the third cause of action for promissory estoppel.[10]

**IT IS SO ORDERED.**

---

than the salary the plaintiff was currently receiving at the firm.

**10.** Final pretrial and trial shall go forward as previously scheduled on October 9th and 26th.